UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                               :

DR. HOLLY ATKINSON et al.,            :

                               :

                  Plaintiffs,    :

                               :                        19-CV-3779 (VSB)

          - against -          :

                               :                **OPINION & ORDER**

                               :

DR. PRABHJOT SINGH et al.,       :

                               :

                  Defendants.   :

                               :
----------------------------------------------------------X

Appearances:

Paul Peter Hughes
John F.O McAllister
McAllister Olivarius
Maidenhead, United Kingdom
Saratoga Springs, New York
*Counsel for Plaintiffs*

Bettina Barasch Plevan
Edna Doris Guerrasio
Joseph Baumgarten
Proskaeur Rose LLP
New York, New York
*Counsel for Defendants Mount Sinai Health System, Inc., Prabhjot Singh, Dennis S. Charney,*
*and Bruno Silva*

Mark S. Mancher
William Kang
Jackson Lewis P.C.
Melville, New York
*Counsel for Defendant David Berman*

VERNON S. BRODERICK, United States District Judge:

Plaintiffs, eight current and former employees of the Arnhold Institute for Global Health ("AIGH"), which is part of Defendant Mount Sinai Health System, Inc.'s ("Sinai") Icahn School of Medicine, assert twenty-five causes of action under various federal and state laws, related primarily to various forms of gender, race, religious, and national origin discrimination against Sinai and the individuals named as Defendants, who are or were either colleagues or superiors of Plaintiffs at AIGH and Sinai.  Currently pending before me are (1) a partial motion to dismiss certain claims in Plaintiffs' First Amended Complaint and Demand for Jury Trial, (Doc. 30 ("First Amended Complaint" or "FAC")); (2) a motion to dismiss all of Plaintiffs' causes of action pled against Defendant David Berman; (3) a motion to strike the FAC; and (4) Plaintiffs' motion for leave to file Plaintiffs' proposed Second Amended Complaint and Demand for Jury Trial, (Doc. 67-1 ("Second Amended Complaint" or "SAC")), which would, among other things, join Ann Marie Beddoe as the ninth plaintiff.  For the reasons that follow, the partial motion to dismiss is GRANTED IN PART and DENIED IN PART, Defendant Berman's motion to dismiss is GRANTED, the motion to strike is DENIED, and the motion for leave to file the Second Amended Complaint is DENIED.

## I.     **Factual Background**[1]

Because many portions of the pleadings are not relevant to Plaintiffs' claims of discrimination and to my resolving the pending motions, I will only give a general overview of the facts and the parties in this section of the Opinion & Order.  In the course of my discussion of how the law applies to the facts of this case, *infra* Pt. IV.A, I recount the facts necessary to

---

[1] The facts contained in this section are based upon the factual allegations set forth in Plaintiff's FAC and SAC.  I assume the allegations in those documents to be true in considering the motions to dismiss pursuant to Federal Rule of Civil Procedure Rule 12(b)(6).  *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  My reference to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

render decisions on the pending motions.

"Plaintiffs are former and current employees of" AIGH, (FAC ¶ 2; *see also* SAC ¶ 2 (same)),[2] a "global health center" that was founded "to train, mentor, and equip U.S. medical students to pursue careers in global health, and to increase local health care capacity in medically under-resourced areas around the world," (FAC ¶¶ 38, 41). In April of 2013, Mount Sinai Global Health was renamed AIGH in recognition of a large donation Sinai had received. (*Id.* ¶¶ 48–49.) This donation allowed Sinai to expand AIGH, and, in February 2015, Defendant Dennis Charney ("Charney"), Dean of Mount Sinai and President of Academic Affairs, after considering various candidates, hired Prabhjot Singh ("Singh") to lead the newly-expanded AIGH as its Director. (*See id.* ¶¶ 51, 67, 112, 114.) Singh was chosen for this position when he was 32 years old and "still completing his residency at Mount Sinai." (*Id.* ¶ 4.) Singh was not qualified to serve as AIGH's director, especially when compared to the other candidates who were considered for the position. (*See, e.g.*, *id.* ¶¶ 59, 76.)

Broadly speaking, Singh and other Defendants allegedly discriminated against Plaintiffs on the basis of gender, age, race, religion, and national origin. (*See, e.g.*, *id.* ¶¶ 1, 138–42, 424.) "Charney knew of and approved of Singh's plan to rid AIGH of all the old staff and replace them with young graduates," and that, because Singh was prevented by "Mount Sinai's HR policies . . . from firing employees at will," he instead sought "to get rid of the 'legacy staff'" by "mak[ing] them leave 'voluntarily.'" (*Id.* ¶ 142.) Plaintiffs' allegations describe what appear to be uncoordinated acts taken by Defendants, including Singh, rather than actions taken in furtherance of some central plan or policy. (*See generally, e.g.*, *id.* ¶¶ 176–90, 207–27, 244–273, 274–96,

---

[2] "FAC" and "First Amended Complaint" refer to Plaintiffs' First Amended Complaint and Demand for Jury Trial. (Doc. 30.) "SAC" and Second Amended Complaint" refer to Plaintiffs' Proposed Second Amended Complaint and Demand for Jury Trial. (Doc. 67-1.)

303–27, 331–37, 343–54, 357–75, 378–80, 388–430, 461–64; *see also, e.g.*, *id.* ¶¶ 484 ("Singh's pattern of insulting and ignoring Atkinson made her feel inadequate and incompetent."); 497 ("Singh's need to diminish others, especially the women who worked for him, meant Safo effectively lost two years of productive work"); 506 ("Prior to joining AIGH, Llames felt confident in her professional abilities, but Singh's campaign of treating her as if she were invisible undermined her confidence. Her self-esteem plummeted, and she cried at least twice a week due to Singh's treatment.").) Charney engendered a discriminatory "culture" at Sinai, and that this culture "allowed Singh to thrive." (*See id.* ¶ 12.) Singh "created" a "culture" that "enabled imitators." (*Id.* ¶ 7). For example, "Singh did nothing to curb" Defendant Bruno Silva ("Silva"), an employee of Mount Sinai, who "regularly called women 'bitches' and 'cunts' . . . and made constant disparaging remarks about their appearance." (*Id.* ¶ 8.)

## II.     Procedural History

Plaintiffs commenced this action on April 26, 2019 by filing a 174-page complaint asserting twenty-five causes of action. (Doc. 1.) Plaintiffs filed the 190-page FAC on August 6, 2019. (Doc. 30.) On September 5, 2019, Defendants Sinai, Singh, Charney, and Silva (collectively, the "Sinai Defendants"), filed a partial motion to dismiss the FAC, (Doc. 38), as well as a motion to strike the FAC, (Doc. 36.) On that same day, Defendant David Berman ("Berman") filed a motion to dismiss every claim asserted against him. (Doc. 33.) After receiving an extension of time, (Doc. 45), and my permission to file excess pages, (Doc. 48), on October 17, 2019, Plaintiffs filed a combined brief in opposition to both motions to dismiss, (Doc. 53), and their opposition to the motion to strike, (Doc. 52). Defendants filed reply briefs in support of the motions to dismiss and to strike on November 20, 2019, (Doc. 57), and on November 21, 2019, (Docs. 58–59).

3

While the motions to dismiss and to strike were still pending, on September 21, 2020, Plaintiffs filed a motion for leave to file the proposed SAC. (Doc. 65.) After receiving an extension of time, (Doc. 71), on October 19, 2020, Defendants filed briefs opposing Plaintiffs' requested leave. (Docs. 72–73.) Plaintiffs filed a reply brief in support of the motion for leave on November 2, 2020. (Doc. 76.)

### III.   <u>Legal Standard</u>

#### A. *Rule 12(b)(6)*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be

true, this tenet is "inapplicable to legal conclusions." *Id.*

A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

### B. *Rule 15(a)*

Rule 15(a) provides that leave to amend a pleading should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend, however, need not be granted where doing so would be futile. *See Foman v. Davis,* 371 U.S. 178, 182 (1962); *see also Kim v. Kimm*, 884 F.3d 98, 106 (2d Cir. 2018) ("It is well established that leave to amend a complaint need not be granted when amendment would be futile." (citation omitted)); *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F. 3d 723, 728 (2d Cir. 1998) ("[I]t is proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile."). "Amendment is futile if the proposed amended complaint could not survive a motion to dismiss." *Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 147 (S.D.N.Y. 2012) (citing *Ricciuti v. New York City Transit Authority*, 941 F.2d 119, 123 (2d Cir. 1991)). The decision whether to grant leave to amend is within the sound discretion of the district court. *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995).

### C. *Rule 12(f)*

Rule 12(f) of the Federal Rules of Civil Procedure "provides courts a means to remove material from a pleading that it finds 'redundant, immaterial, impertinent, or scandalous.'" *Hirsch v. Complex Media, Inc.*, No. 18 Civ. 5488 (CM), 2018 WL 6985227, at *9 (S.D.N.Y. Dec. 10, 2018) (quoting Fed. R. Civ. P. 12(f)). "[M]otions to strike are generally disfavored and

will not be granted unless the matter asserted clearly has no bearing on the issue in dispute."

*Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 829 (S.D.N.Y. 2008)

(internal quotation marks omitted). "To prevail in such a motion, defendants must demonstrate

that (1) no evidence in support of the allegations would be admissible; (2) that the allegations

have no bearing on the issues in the case; and (3) that to permit the allegations to stand would

result in prejudice to the movant." *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y.

2001) (internal quotation marks omitted).

## IV. <u>Discussion</u>

### A. *Defendants' Motions to Dismiss and Opposition to Leave to Amend*

The Sinai Defendants move to dismiss the First, Second, Third, Fourth, Seventh, Eighth,

Thirteenth, Seventeenth, Eighteenth, Nineteenth, Twentieth, Twenty-First, and Twenty-Second

Causes of Action of the FAC. (Sinai MTD 1).[3] They also oppose the filing of the SAC on the

grounds that it fails to cure defects in certain causes of action in the FAC that are otherwise time-

barred; that two newly-pleaded causes of action fail to state claims and would be futile under

Rule 12(b)(6); and that the SAC's proposed new plaintiff, Ann Marie Beddoe ("Beddoe"),

cannot be properly joined in this action under Federal Rule of Civil Procedure 20. (*See generally*

Sinai Leave Opp. 2, 5–9, 19–22.)[4] Separately, Defendant Berman moves to dismiss the Fifth,

Sixth, Seventh, Eighth, Ninth, and Tenth Causes of Action of the FAC as pleaded against him,

(Berman MTD 1),[5] which are the only causes of action against him, (*see generally* FAC), and he

---

[3] "Sinai MTD" refers to the Sinai Defendants' Memorandum of Law in Support of Their Partial Motion to Dismiss. (Doc. 39.)

[4] "Sinai Leave Opp." refers to the Sinai Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Amend. (Doc. 73.)

[5] "Berman MTD" refers to Defendant Berman's Memorandum of Law in Support of His Motion to Dismiss. (Doc. 35.)

6

opposes leave to file the SAC on the grounds that it offers no new facts that "have anything to do with the claims asserted against him by the three [P]laintiffs" who assert claims against him, (Berman Leave Opp. 2).[6]

Because, as explained *supra*, a motion for leave should be denied if the proposed amended pleadings would not survive a motion to dismiss, I analyze the motions to dismiss together with the motion for leave. I begin by discussing a threshold issue: the scope of my subject matter jurisdiction over Plaintiffs' claims. I next turn to the arguments concerning each Plaintiff whose claims are challenged by the motions to dismiss and by Defendants' opposition to the motion for leave to amend.

### 1. Summary of Findings Related to Subject Matter Jurisdiction Over Plaintiffs' Claims

In both the FAC and the proposed SAC, Plaintiffs assert federal discrimination claims under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681–88, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634, as well as a claim under 29 U.S.C. § 206(d) for gender-based discrimination in pay. Plaintiffs also assert state law claims under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290–301, the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. § 8-107, a claim for unequal pay under the New York Labor Law § 194, and a claim for breach of contract. My subject matter jurisdiction over Plaintiffs' non-federal claims is premised on supplemental jurisdiction under 28 U.S.C. § 1367(a). (*See* FAC ¶ 31; SAC ¶ 32 (same).) Although Plaintiffs have styled the FAC with 25 "cause of action" headings (and with 27 such headings in the SAC),

---

[6] "Berman Leave Opp." refers to Defendant Berman's Memorandum of Law in Opposition to Plaintiffs' Motion to Amend. (Doc. 72.)

almost every one of these headings is used to assert four analytically-similar, yet legally-distinct causes of action that arise out of the same facts—one arises under Title IX, one arises under Title VII, and two arise under state law. (*See, e.g.*, FAC 140 & ¶¶ 517–533 (pleading as the "First Cause of Action" Plaintiff Atkinson's claim for "unlawful sex discrimination" under "Title IX, Title VII, NYSHRL, and NYCHRL").)

> A district court has
>
> supplemental jurisdiction over all claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). "For purposes of section 1367(a), claims 'form part of the same case or controversy' if they 'derive from a common nucleus of operative fact.'" *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 308 (2d Cir. 2004)). This will be true, for example, where both a plaintiff's state and federal labor law claims "arise out of the same compensation policies and practices," *id.*, or where an individual plaintiff's "state discrimination claim arises out of approximately the same set of events as his federal retaliation claim," *Treglia v. Town of Manlius*, 313 F.3d 713, 723 (2d Cir. 2002). However, "the mere fact" of "a common employer/employee relationship between the parties d[oes] not establish supplemental jurisdiction[] without evidence of some further factual connection between the claims." *Guerra v. Trece Corp.*, No. 18 CIV. 625 (ER), 2020 WL 7028955, at *6 (S.D.N.Y. Nov. 30, 2020) (citing *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 468 (S.D.N.Y. 2008)).

Where a plaintiff asserts sufficient federal discrimination claims, related state law discrimination claims fall within a district court's supplemental jurisdiction. *See Treglia*, 313 F.3d at 723 ("Supplemental jurisdiction in this case is proper because Treglia's state

discrimination claim arises out of approximately the same set of events as his federal retaliation claim."). By contrast, "[c]ourts in this District routinely decline to exercise supplemental jurisdiction over a plaintiff's state law claims, including NYCHRL claims and common law torts, after dismissing all federal claims" of discrimination that a plaintiff asserts. *See Braunstein v. Sahara Plaza, LLC*, 16-CV-8879 (VSB), 2021 WL 2650369, at *19 (S.D.N.Y. June 28, 2021) (collecting cases).

With these principles in mind, and given that the parties' briefings on the pending motions analyze each individual Plaintiff's claims on a Plaintiff-by-Plaintiff basis, I find it appropriate to take supplemental jurisdiction over a particular Plaintiff's non-federal claims only where she or he sufficiently pleads a federal claim.

### 2. Plaintiffs Atkinson's and Anandaraja's Claims[7]

The Sinai Defendants argue that all the claims asserted by Plaintiff Dr. Holly Atkinson ("Atkinson"), save for Atkinson's breach of contract claim (Twenty-Third Cause of Action), and all of the claims asserted by Plaintiff Dr. Natasha Anushri Anandaraja ("Anandaraja"), must be dismissed. (*See* Sinai MTD 1.) They argue that the First through Fourth and Seventeenth through Twentieth Causes of Action are time-barred, (*id.* at 1–2), and that the Twenty-Sixth Cause of Action of the SAC—a state law retaliation claim that Anandaraja asserts based on events that occurred after the filing of the initial complaint in this action, (*see* SAC ¶¶ 999–1009)—is not supported by sufficient factual allegations, (Sinai Leave Opp. 2.)

---

[7] This section relates to the First through Fourth, Seventeenth through Twentieth, and Twenty-Third Causes of Action of the FAC, the allegations from the SAC that support those claims, and to the proposed Twenty-Sixth Cause of Action in the SAC.

### a.  Statute of Limitations

In Counts 1 through 4 and 17 through 20,[8] Atkinson and Anandaraja assert federal claims under Title IX, Title VII, and the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. §§ 621–634.  Discrimination claims under Title IX are subject to a three-year statute of limitations.  *Curto v. Edmundson*, 392 F.3d 502, 504 (2d Cir. 2004), *cert. denied*, 545 U.S. 1133 (2005).  Discrimination claims brought under either the ADEA or Title VII must be filed with the EEOC within 300 days of the alleged discriminatory act to be timely.  29 U.S.C. § 626(d)(1)(B); 42 U.S.C. § 12117(a).

Here, because Plaintiffs filed with the EEOC on April 26, 2019, (Docs. 40-1 & 40-2), the same day they filed their original complaint in this action, (*see* Doc. 1), Atkinson and Anandaraja's ADEA and Title VII claims will be untimely unless they are supported by at least one act that "occurred less than 300 days prior to" April 26, 2019.  *See Mercedes v. Dep't of Educ*, 16-CV-3284 (VSB), 2018 WL 4682015, at *7 (S.D.N.Y. Sept. 28, 2018), *aff'd sub nom. Mercedes v. N.Y.C. Dep't of Educ.*, 779 F. App'x 44 (2d Cir. 2019).  Similarly, their Title IX claims will be untimely unless they are supported by at least one act that occurred within the three-year period spanning April 26, 2016 to April 26, 2019.  *See Curto*, 392 F.3d at 504.

### i.  *Continuing Violation Doctrine*

As their lead argument in support of the timeliness of Atkinson and Anandaraja's claims, Plaintiffs contend that Atkinson and Anandaraja were subjected to a "continuous practice of discrimination" during their employment at Sinai.  (MTD Opp. 4–5.)  In other words, they are arguing that the continuing violation doctrine applies to render Atkinson and Anandaraja's

---

[8] In this Opinion & Order, I use the capitalized terms "Count" and "Counts" interchangeably with capitalized terms "Cause of Action" and "Causes of Action" to refer to the claims asserted in Plaintiffs' FAC and SAC.

10

claims timely even if "certain aspects" of their allegations "occurred" outside the relevant time periods. (*See id.* at 5 (collecting cases discussing "continuing discriminatory conduct" (citation omitted)).)

For a plaintiff to "qualify for" the "continuing violation doctrine," she "must allege that at least one of the discriminatory acts furthering [an] alleged policy of discrimination occurred within the limitations period." *Isbell v. City of New York*, 316 F. Supp. 3d 571, 586–87 (S.D.N.Y. 2018) (Broderick, J.) (citing *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011)). In other words, "the plaintiff 'must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy.'" *Volpe v. N.Y.C. Dep't of Educ.*, 195 F. Supp. 3d 582, 594 (S.D.N.Y. 2016) (quoting *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009)). "Essentially, the continuing violation doctrine is only applicable when there is a specific policy or mechanism of discrimination being committed by a defendant[,] and multiple incidents of discrimination, *even similar ones*, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Kpaka v. CUNY*, No. 14-CV-6021 (RA), 2016 WL 4154891, at *5 (S.D.N.Y. Aug. 2, 2016) (internal quotation marks omitted), *aff'd*, 708 F. App'x 703 (2d Cir. 2017). "The doctrine has generally been limited to situations where there are specific policies or mechanisms, such as discriminatory seniority lists or employment tests." *Crosland v. City of New York*, 140 F. Supp. 2d 300, 307 (S.D.N.Y. 2001), *aff'd sub nom. Crosland v. Safir*, 54 F. App'x 504 (2d Cir. 2002).

Further, a plaintiff must clearly plead a continuing violation both in her EEOC filing and in her complaint in order to invoke the doctrine and overcome what would otherwise be a time bar. *Fitzgerald v. Henderson*, 251 F.3d 345, 360 (2d Cir. 2001) ("[A] plaintiff may not rely on a continuing violation theory of timeliness unless she has asserted that theory in the administrative

11

proceedings."); *Carmellino v. Dist. 20 of N.Y.C. Dep't of Educ.*, No. 03 Civ. 5942 (PKC), 2004 WL 736988, at *13 (S.D.N.Y. Apr. 6, 2004) ("continuing violation must be 'clearly asserted both in the EEOC filing and in the complaint.'" (quoting *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 25 (2d Cir. 1985))). "[A] continuing violation may not be based on an employee's having suffered from the effects of an earlier discriminatory act." *Miller*, 755 F.2d at 25; *cf., e.g.*, *Carmellino*, 2004 WL 736988, at *13 ("The cover sheet of Magaldi's EEOC charge requested that she indicate whether the defendants' alleged discrimination was of a continuing nature. She made no such indication. Reviewing Magaldi's EEOC charge in the light most favorable to her, I conclude that it does not allege a continuing violation."); *Simmons v. AT&T Corp.*, 182 F.3d 901 (2d Cir. 1999) (table opinion) (affirming dismissal of Title VII claims as time-barred because plaintiff "failed to assert a continuing violation theory in her EEOC filings or in her complaint, both of which mention the harassment only tangentially. This omission is fatal to her appeal"); *Godfrey v. Ethan Allen, Inc.*, 113 F.3d 1229 (2d Cir. 1997) (table opinion) ("Clarke cannot rely on a continuing violation theory because he did not assert such a theory in his EEOC filing").

Here, Plaintiffs' allegations "are insufficient to establish a discriminatory policy necessary for the continuing violation doctrine to apply." *Kpaka*, 2016 WL 4154891, at *5. Rather, and despite the inclusion of phrases like "troubling pattern of disparate treatment of women" in their pleadings, (*e.g.*, FAC ¶ 251), Plaintiffs plead what amount to "merely several discrete acts." *Fierro v. N.Y.C. Dep't of Educ.*, 994 F. Supp. 2d 581, 587 (S.D.N.Y. 2014) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–15 (2002)), *abrogated on other grounds*, *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 100 n.7 (2d Cir. 2020). For example, Atkinson alleges she was strongarmed into agreeing to work full-time, rather than part-

12

time, for the same salary she had been paid while working part-time, (FAC ¶¶ 180–81), and Atkinson and Anandaraja both allege that Singh "demeaned" them on various occasions, (*see id.* ¶¶ 184 ("Singh downplayed the[] importance" of work Atkinson did and "claim[ed] she took way too long to prepare" her work), 208 ("Singh regularly denigrated Anandaraja's work with harsh and cutting critiques.").).

Moreover, neither Atkinson nor Anandaraja's EEOC charges are premised on "a continuing violation theory," which prevents them from "rely[ing] on" a continuing violation theory at the motion to dismiss phase. *Fitzgerald*, 251 F.3d at 360. Both Atkinson and Anandaraja's EEOC filings leave the "Continuing Action" box unchecked. (Doc. 40-1; Doc. 40-2.) In addition, Plaintiffs do not make any argument or point to any allegations showing how Atkinson or Anandaraja might have otherwise "asserted" a "continuing violation theory of timeliness" as part of their underlying "administrative proceedings" with the EEOC. *Fitzgerald*, 251 F.3d at 360. They thus cannot rely on a continuing violation theory in their proceedings before me.

ii.  *Timely Acts Supporting Discrimination Claims*

Separately, and regardless of whether Plaintiffs allege a continuing violation or an identifiable policy or practice of discrimination, Plaintiffs have not alleged any "non-time-barred acts taken" against Atkinson or Anandaraja that can support their Title IX, ADEA, or Title VII claims. *Cf. Shomo*, 579 F.3d at 181. They say Atkinson continued in a role to which she was "unfairly demoted" through her final day of employment on April 29, 2016, (MTD Opp. 4), but it is the demotion itself that would have constituted the adverse employment action giving rise to a claim, not Atkinson's continuing to work for AIGH in the demoted position. *See Volpe*, 195 F. Supp. 3d at 597 (explaining that legally-cognizable adverse action has "accompanying adverse

result[s] such as demotion, diminution of wages, or other tangible losses" (citing, inter alia, *Treglia*, 313 F.3d at 720)). Similarly, Plaintiffs do not point to any timely, relevant acts with respect to Anandaraja.[9] They plead that Anandaraja was "effectively demot[ed]" in the second half of 2015, (*see* FAC ¶¶ 217–18), which predates the relevant time period. They also plead that, after Anandaraja left Sinai in June of 2016, she "learned that Singh had told at least two of her colleagues . . . that she had not performed adequately and had actively undermined their work," which "undermined friendships built over many years and caused a significant rift between Anandaraja and Murphy, a close mentor." (FAC ¶ 228.) Plaintiffs do not explain how this post-employment slight could give rise to or bolster an employment discrimination claim.

The SAC does not provide new allegations that render Atkinson and Anandaraja's claims timely. With respect to Anandaraja, Plaintiffs offer no new facts in the SAC as to timeliness. Instead, their briefing in support of leave to amend rehashes the same arguments as to why Anandaraja's claims are timely. (*Compare* Leave Reply 2[10] *with* MTD Opp. 4.)

With respect to Atkinson, Plaintiffs plead she received her "final paycheck from AIGH, still reduced [due to] Singh's direction, . . . on May 6, 2016." (SAC ¶ 211.) They use this to argue that Atkinson's claims are timely under the Lilly Ledbetter Fair Pay Act. (Leave Reply 3.) Under the Ledbetter Act, "a new Title VII claim arises each time that a plaintiff receives a

---

[9] Plaintiffs say that Singh "continued his discriminatory treatment" of Anandaraja after she gave notice of her resignation in January of 2016, (MTD Opp. 4), but the allegations from the FAC they cite in support of this position cannot sustain a federal discrimination claim. In the relevant paragraphs, Plaintiffs allege that Anandaraja "attended a meeting" in which she was "barely" allowed to "speak," (FAC ¶ 223), and that Singh "did not let up on his bullying" by "demand[ing] that she train replacement staff" while "disinvit[ing] her from meetings she needed to" attend to "do so," as well as by refusing to "speak[] to" her about and "ignor[ing] her requests for meetings necessary to an efficient transition," (*id.* ¶ 224). As pleaded in these paragraphs, Singh's behavior is "obnoxious and sophomoric," but nothing connects his behavior to Anandaraja's "gender" or any other protected characteristic, and as such, these paragraphs do "not support a claim of discrimina[tion]." *See Kamrowski v. Morrison Mgmt. Specialist*, No. 05–CV–9234 (KMK), 2010 WL 3932354, at *15 (S.D.N.Y. Sept. 29, 2010) (citing *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004)).

[10] "Leave Reply" refers to Plaintiffs' Combined Memorandum of Law in Reply to Defendants' Oppositions to Plaintiffs' Motion for Leave to File the Second Amended Complaint. (Doc. 76.)

14

paycheck pursuant to 'a discriminatory compensation decision or other practice.'" *Wynn v. Union Loc. 237, I.B.T.*, 797 F. App'x 13, 16 (2d Cir. 2019) (quoting 42 U.S.C. § 2000e-5(e)(3)(A)). However, the Ledbetter Act's accrual rule only applies if "the compensation itself was set in a discriminatory manner," not to a situation where a person was demoted in a discriminatory manner and then received lower pay pursuant to an otherwise-nondiscriminatory system of pay. *Davis v. Bombardier Transp. Holdings (USA) Inc.*, 794 F.3d 266, 269 (2d Cir. 2015) ("A plaintiff must plead and prove the elements of a pay-discrimination claim to benefit from the Ledbetter Act's accrual provisions."). In *Davis*, the Second Circuit held that a plaintiff could not "salvage her time-barred demotion claim by virtue of a concomitant pay reduction . . . because her claim [wa]s based on the theory that she was demoted and paid less," but, critically, her pay in her new position "was the same as all other . . . employees" with her same classification. *Id.* at 271 & n.3. The Second Circuit contrasted this result with a situation where a "victim" of "[p]ay discrimination" does not know that her pay is discriminatory until she receives her paycheck and "compare[s]" it "to that of h[er] co-workers." *See id.* at 270.

Here, the Ledbetter Act's accrual rule does not render Atkinson's claims timely, because she pleads that her May 6, 2016 paycheck was the result of "a pay reduction that flows from another adverse employment action," not a paycheck she received in circumstances giving rise to a "traditional pay-discrimination claim[]." *Id.* at 271; *Wynn*, 797 F. App'x at 16 ("Plaintiffs cannot benefit from the Ledbetter Act, which" . . . "was directed 'to a very specific type of claim: that the employer is paying different wages or providing different benefits to similarly situated employees.'" (internal quotation marks omitted) (quoting *Poullard v. McDonald*, 829 F.3d 844, 853 (7th Cir. 2016))). Specifically, Atkinson pleads that Singh "wanted her to leave," and thus gave her the ultimatum that she could only "still have a job at AIGH" if "she immediately agreed

15

to work full-time rather than her current part-time (*i.e.*, 0.6 FTE) basis, but for no additional money," which "in effect amounted to an immediate 40% reduction in Atkinson's salary." (SAC ¶ 201.) There are no allegations to the effect that "similarly situated persons outside" Atkinson's protected class "received higher wages." *Davis*, 794 F.3d at 271 (quoting *MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 774 (11th Cir. 1991)). Accordingly, the SAC does not save Atkinson's time-barred claims.

### iii. *Equitable Estoppel*

Plaintiffs also argue that Atkinson and Anandaraja's claims should be found timely under the doctrine of equitable estoppel. (MTD Opp. 6.) In essence, this doctrine allows a court to set aside a statute of limitations when a defendant tricks a plaintiff into delaying her filing of a claim until it is no longer timely. "To invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995). Moreover, "to invoke a defendant's misconduct as a basis for equitable tolling or estoppel, 'a plaintiff must show that he brought his action within a reasonable time after the facts giving rise to the estoppel have ceased to be operational.'" *Rubert v. King*, No. 19-CV-2781 (KMK), 2020 WL 5751513, at *5 (S.D.N.Y. Sept. 25, 2020) (quoting *Buttry*, 68 F.3d at 1494); *Harper v. Ercole*, 648 F.3d 132, 136 (2d Cir. 2011) (explaining that a statute of limitations is suspended only "for the duration of the extraordinary circumstances supporting tolling," after which the statute of limitations continues to run).

Plaintiffs plead no facts to support the use of the equitable estoppel doctrine to defeat Defendants' statute of limitations defense. First, there are no allegations of a "definite

16

misrepresentation of fact" that Defendants gave to Plaintiffs in order to make Plaintiffs' claims untimely. *Cf. Buttry*, 68 F.3d at 1493. Rather, Plaintiffs argue that Sinai's Human Resources department "induced" them to delay filing by telling Atkinson and Anandaraja that it was taking their "complaints seriously and would properly and thoroughly investigate," (*see* MTD Opp. 6 (citations omitted)), but they plead no facts suggesting these representations were untrue. Second, Plaintiffs plead facts that belie the notion that they reasonably thought that Sinai's internal investigation would result in a positive outcome from their perspective, such as Singh's ouster, because they allege that they were told that "the final outcome of any investigation would depend on what Mount Sinai stood to gain or lose as an institution, and [Defendant] Charney would be the one to decide." (FAC ¶ 433; SAC ¶ 485 (same).) Thus, Plaintiffs were on notice that Charney, who they allege was Singh's constant champion and defender at AIGH, (*see, e.g.*, SAC ¶¶ 126 (discussing "Charney's infatuation with Singh"), 162 ("Charney knew and approved of Singh's plan to rid AIGH of all the old staff and replace them with young graduates.")), would control the result of the investigation. There are no allegations that reconcile Plaintiffs' inducement claims with the fact that Charney would be the ultimate decisionmaker of the investigation.

### b. Conclusion as to Atkinson and Anandaraja

I hold that Atkinson and Anandaraja's federal claims are time-barred. Therefore, I do not take supplemental jurisdiction over their state law claims, including Atkinson's breach of contract claim at Count 23 of the FAC and Anandaraja's retaliation claim under the NYCHRL at Count 26 of the SAC. Accordingly, Atkinson and Anandaraja's claims are DISMISSED.

17

### 3.  Plaintiff Khan's Claims[11]

Plaintiff Humale Khan ("Khan") alleges claims for hostile work environment and retaliation under Title VII, the NYSHRL, and the NYCHRL.  The Sinai Defendants argue that Khan's hostile work environment claim fails because the pleadings do not establish "a severe or pervasive work environment or . . . that Khan was treated less well because of a protected characteristic," or that the pleadings show a causal connection between Khan's alleged retaliation and any "protected activity" in which he engaged.  (*See* Sinai MTD 15.)

#### a.  Khan's Hostile Work Environment Claim[12]

Title VII of the 1964 Civil Rights Act makes it unlawful for any employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  This provision provides causes of action for both discrimination and hostile work environment.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  "It is axiomatic that the plaintiff . . . must show that the hostile conduct occurred because of a protected characteristic."  *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002).  As such, at the motion to dismiss stage, a plaintiff must plead facts showing that "the workplace is permeated with discriminatory intimidation, ridicule, [or] insult[s]."  *Littlejohn v. City of New York*, 795 F.3d 297, 320 (2d Cir. 2015).

A hostile work environment claim requires a plaintiff to show, among other things, conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment."  *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (quoting *Alfano*, 294

---

[11] This section relates to the Twenty-First and Twenty-Second Causes of Action in the FAC, as well as to the allegations from the SAC that support those claims.

[12] Khan's hostile work environment claim is the Twenty-First Cause of Action.

F.3d at 373); *see also Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 59 (2d Cir. 2004) (conduct giving rise to a hostile work environment must have been enough to have "interfered with [the plaintiff's] ability to do her job."). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano*, 294 F.3d at 374 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). With that said, a "single incident" can establish a hostile work environment if it is "extraordinarily severe," such as if the incident "can and does work a transformation of the plaintiff's workplace." *Id.* (citations omitted); *see, e.g.*, *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) ("even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment" (citation omitted)); *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) ("Although Holdsworth made his obscene comments only on one occasion, the evidence is that he did so at length, loudly, and in a large group in which Howley was the only female and many of the men were her subordinates. And his verbal assault included charges that Howley had gained her office of lieutenant only by performing fellatio.").

Importantly, because Title VII only covers "discriminat[ory]" behavior, *see* § 2000e-2(a)(1), a hostile work environment claim is not sufficiently pled unless the alleged hostility that changes the conditions of a plaintiff's job is the result of discrimination based on a characteristic protected by applicable law. *See Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) (concluding that no hostile work environment existed even though "defendants wrongly excluded [the plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her"); *Davis–Molinia v. Port Auth. of N.Y. & N.J.*, No. 08 CV

19

7586(GBD), 2011 WL 4000997, at *11–12 (S.D.N.Y., Aug. 19, 2011) (finding that conduct including "diminished [job] responsibilities," "exclu[sion] from staff meetings," deliberate "avoid[ance]," and "yell[ing] and talk[ing] down," was non-actionable because nothing showed that "the conduct targeted [plaintiff's] membership in a protected class"), *aff'd*, 488 F. App'x 530 (2d Cir. 2012).

Here, Plaintiffs do not plead facts tending to show that Khan was made to suffer "sufficiently continuous" discriminatory acts or any "single incident" that worked to transform Khan's workplace. The Second Circuit has held that even repeated rude and nasty behavior does not amount to a hostile work environment.[13] In the FAC, Plaintiffs allege three incidents in which Silva, Khan's coworker,[14] said of Khan, who is Pakistani and a Muslim, that "[Khan] says he's out praying, but he's probably out interviewing," and "'it smells like curry' in Khan's office," as well as "it smells like shit in here," also seemingly in regard to Khan's office. (FAC ¶ 424.) In the SAC, Plaintiffs allege that Silva "made derogatory comments about Eid, a Muslim tradition that involves . . . humanely slaughter[ing] a goat" to Khan, calling Khan's family "'backwards' and 'weird'" for their participation in Eid. (SAC ¶ 476.) Although Silva's

---

[13] *Cf. Littlejohn*, 795 F.3d at 321 (holding "allegations could not support a finding of hostile work environment" where allegations included "negative statements about [plaintiff] Littlejohn to Mattingly; Baker was impatient and used harsh tones with Littlejohn; Baker distanced herself from Littlejohn when she was nearby; Baker declined to meet with Littlejohn; Baker required Littlejohn to recreate reasonable accommodation logs; Baker replaced Littlejohn at meetings; Baker wrongfully reprimanded Littlejohn; and Baker increased Littlejohn's reporting schedule. Baker also sarcastically told Littlejohn 'you feel like you are being left out,' and that Littlejohn did not 'understand the culture' at [the workplace].").

[14] For the federal claims, "[a] plaintiff who has suffered a hostile work environment at the hands of a co-worker must show that 'there is a specific basis for imputing the conduct creating the hostile work environment to the employer' before the employer can be held liable." *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 174–75 (E.D.N.Y. 2015) (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013)). By contrast, "the NYSHRL and NYCHRL permit suits against individual supervisors." *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 157 (2d Cir. 2017) (citing *Feingold*, 366 F.3d at 157–59). Plaintiffs do not allege facts suggesting that Silva's conduct can be imputed to Sinai, which provides a separate basis for dismissing both of Khan's claims.

20

comments are plausibly targeted to Khan's religion and national origin,[15] Plaintiffs plead no facts suggesting that Silva's comments "interfered with [Khan's] ability to do [his] job." *Cf. Mormol*, 364 F.3d at 59.[16] Indeed, the only thing Plaintiffs say about how Silva may have interfered with Khan's work is the vague allegation that Khan "told" someone that "even when he tried to work around Silva, [Silva] would insert himself to sabotage Khan's project." (SAC ¶ 482; *see also* FAC ¶ 430 (alleging that Khan told Singh that "Silva was delaying his contributions to Khan's projects so as to derail them.").) This and similar allegations are too nebulous to pass muster under Rule 8. *See Kassner*, 496 F.3d at 240 (allegation that "defendants 'pressured plaintiffs to retire from employment'" was "so vague that it fails to provide defendant with fair notice" of a "hostile work environment claim."). Moreover, Plaintiffs allege no facts suggesting that Silva's acts of "sabotage" were caused in any way by a "protected characteristic" Khan possesses, *see Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 6 (2d Cir. 2017), much less that the sabotage was so "severe" that it effected "a transformation of [Khan's] workplace," *Alfano*, 294 F.3d at 374.

b. Khan's Retaliation Claim[17]

To plead a retaliation claim under Title IX or Title VII, "the plaintiff must plausibly

---

[15] With regard to the comments from the FAC, the Sinai Defendants argue otherwise, saying that "none of" Silva's comments directly "refer to Khan's race or national origin." (*See* Sinai MTD 16.) This does not preclude a finding of discrimination: the law "recognizes dog-whistle" discrimination, i.e., discrimination where a speaker "use[s] . . . [f]acially non-discriminatory terms" to "invoke racist concepts that are already planted in the public consciousness, such as 'welfare queen,' 'terrorist,' 'thug,' and 'illegal alien.'" *See, e.g.*, *Mondesir v. N. Shore LIJ Health Sys.*, 14-cv-6496 (JGK), 2016 WL 6952254, at *3 (S.D.N.Y. Nov. 28, 2016) (internal quotation marks omitted). The Sinai Defendants cite a case where a defendant was alleged to have engaged in religious discrimination by, among other things, having "made a comment regarding the smell of cooked fish" in regard to a Muslim man, but the plaintiff did not "provide[] any detail as to how the comment relates to religious discrimination." *Shaw v. McDonald*, 14 cv 5856 (NSR), 2015 WL 8484570, at *4 (S.D.N.Y. Dec. 8, 2015). Here, Plaintiffs persuasively explain that "Silva's snide comments" were "about the smell of . . . food" associated with Khan's culture and thus relate the comment to Khan's relevant protected characteristics. (MTD Opp. 16.)

[16] Plaintiffs do plead that Silva's comments "made Khan deeply self-conscious" and that Khan "started buying and applying multiple deodorants and chewing gum excessively," (FAC ¶ 424), but Plaintiffs never explain whether or how this affected Khan's job performance, nor do they make any reference to Khan's self-consciousness over his perceived body odor or breath in arguing that Khan has sufficiently stated his claims, (*see* MTD Opp. 15–17).

[17] Khan's retaliation claim is the Twenty-Second Cause of Action.

21

allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) because he has opposed any unlawful employment practice." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (internal quotation marks omitted). In other words, "a plaintiff must show '(1) she engaged in an activity protected by the [statute]; (2) the employer was aware of this activity; (3) the employer took an adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity,' that is, the employer acted with a retaliatory motive." *Quadir v. N.Y. State Dep't of Labor*, 39 F. Supp. 3d 528, 542 (S.D.N.Y. 2014) (quoting *Caskey v. Cty. of Ontario*, 560 F. App'x 57, 58 (2d Cir. 2014) (summary order)).

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (internal citations and quotation marks omitted). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 304 (2d Cir. 2017).

Plaintiffs do not allege that Khan suffered any adverse employment action. Instead, they allege that after Singh told Khan that Khan's complaint about Silva would be kept "confidential," Silva "told Khan in a threatening tone" that he "and Sing were very close and talked about everything openly," and that "he would not want there to be any problems in the team." (FAC ¶¶ 427–29.) Plaintiffs say I should infer that this act was "intended to intimidate and threaten" Khan, (MTD Opp. 17), but they offer no explanation of how an act "intended" to

have an effect actually inflicts a "materially adverse change" within the meaning of applicable law, *Shultz*, 867 F.3d at 304; *cf. Alvarez*, 2021 WL 1424851, at *8 (materially adverse changes in support of retaliation claim included "den[ying] tenure"). Indeed, they plead that "Khan was not frightened or deterred." (FAC ¶ 430.) Nor do Plaintiffs argue that some "unique" circumstances at play in this case make Silva's intimations about breached confidentiality a materially adverse employment action for the purposes of this case. *Cf. Shultz*, 867 F.3d at 304.

### c. Conclusion as to Khan

Because I hold that Khan has not sufficiently pleaded his federal claims, I decline to exercise supplemental jurisdiction of Khan's state law claims. Thus, Khan's claims are DISMISSED.

### 4. Plaintiff Caliendo's Claims Against the Sinai Defendants[18]

Plaintiff Mary Caliendo ("Caliendo") alleges claims for disparate treatment and hostile work environment. The Sinai Defendants argue that both counts fail for, among other reasons, a lack of sufficient facts showing a connection between the alleged discrimination and a relevant protected characteristic. (*See* Sinai MTD 23–27.)

"Title VII . . . requires a plaintiff asserting a [disparate treatment] claim to allege two elements: (1) the employer discriminated against him (2) because of his race, color, religion, sex, or national origin." *Vega*, 801 F.3d at 8. The "first element" requires an employer to "tak[e] an adverse employment action against" the plaintiff. *Id.* In order to demonstrate disparate treatment "a plaintiff must show that he was 'similarly situated in all material respects' to the individuals to whom he seeks to compare himself." *Elgalad v. N.Y.C. Dep't of Educ.*, 17-CV-

---

[18] This section relates to the Seventh and Eighth Causes of Action of the FAC as pleaded against the Sinai Defendants.

23

4849 (VSB), 2018 WL 4572237, at *6 (S.D.N.Y. Sept. 24, 2018) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)), *abrogated on other grounds by Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 100 & n.7 (2d Cir. 2020).

There are no pleaded facts suggesting that Caliendo was subjected to disparate treatment because of her gender. Plaintiffs allege that Defendants treated Caliendo far less well than is desirable in a professional setting, (*see, e.g.*, FAC ¶ 390 ("Berman ran up to Caliendo's office and started screaming at her about [a] delay at the top of his lungs.")), and generally aver that "women were second class citizens" in "the culture created by Charney and Singh," (FAC ¶ 383). However, Plaintiffs do not plead specific facts demonstrating how anyone similarly situated to Caliendo was treated better or differently on account of gender, which is the only protected characteristic alleged in support of Caliendo's discrimination claims.[19] This is fatal to Caliendo's disparate treatment claim.

Similarly, there are no pleaded facts suggesting that Caliendo experienced a hostile work environment "because of [the] protected characteristic" of her gender. *Cf. Alfano*, 294 F.3d at 374. Plaintiffs allege that Singh became capriciously "hostile" and "accused Caliendo of 'talking too much'" and "forbade her from talking to anyone else at" AIGH, which left her "withdrawn and unhappy" and prevented her from "develop[ing] working relationships with people around her." (FAC ¶ 380.) They also allege that Berman "scream[ed] at [Caliendo] at the top of his lungs," which left her "fear[ful] he would hit her" and led to her "crying profusely." (FAC ¶ 390.) As deplorable as these allegations are, nothing in the pleadings connects Defendants'

---

[19] Plaintiffs plead that that Singh "forbade [Caliendo] from talking to anyone else at the Institute," (FAC ¶ 380), and they contend that Singh never gave any similar instruction to "any male employee," (MTD Opp. 18). However, Plaintiffs plead no facts supporting this supposed gender disparity; they only make the argument in their briefing. I have independently reviewed the FAC and SAC and did not find any allegations tending to show that Defendants treated any male employees similarly situated to Caliendo any better than they treated Caliendo.

24

conduct to Caliendo's gender. Even if the pleadings concerning Caliendo could be construed as revealing that Defendants' conduct towards Caliendo stemmed from her gender, Plaintiffs fall short of pleading either "a steady barrage of opprobrious [gendered] comments," *Suarez v. New York City Dep't of Hum. Res. Admin.*, No. 09 CIV. 8417 WHP, 2011 WL 1405041, at \*7 (S.D.N.Y. Mar. 24, 2011) (citation omitted), or a single act so "vile and sexually explicit" as to leave Caliendo feeling that doing her job would put her in "peril," *see Alfano*, 294 F.3d at 374.

Therefore, I hold that Caliendo has failed to plead her federal claims for disparate treatment or hostile work environment against the Sinai Defendants, and, as such, I will not take supplemental jurisdiction over her state law claims. Thus, Caliendo's claims in the Seventh and Eighth Causes of Action as pleaded against the Sinai Defendants are DISMISSED.[20]

### 5. Plaintiff Misiti's Retaliation Claims[21]

Plaintiff Amanda Misiti ("Misiti") asserts causes of action for disparate treatment, hostile work environment, and retaliation, (FAC ¶¶ 163–68), but the Sinai Defendants only move to dismiss her retaliation claim, (Sinai MTD 27–28). Misiti's retaliation claim is asserted under Title IX, Title VII, the NYSHRL, and the NYCHRL. (FAC ¶ 168.) Specifically, Plaintiffs allege that after Misiti "submitted an anonymous statement about her concerns with Singh," Singh retaliated by increas[ing] Misiti's workload without increasing her compensation while downgrading her job description." (*Id.* ¶¶ 739–40.) The Sinai Defendants argue that Misiti did not suffer an adverse employment action and that, in any event, the requisite causal connection cannot be inferred because the alleged increase in Misiti's workload occurred after a "five month

---

[20] As explained *infra* Pt. IV.A.4.b, this will result in my not having supplemental jurisdiction over Caliendo's remaining state law claims against Berman due to concessions Plaintiffs make in their briefing of those issues.

[21] This section relates to the Thirteenth Cause of Action of the FAC. Defendants do not move to dismiss Misiti's claims under the Eleventh or Twelfth Causes of Action. As such, she has surviving federal claims in this action, and I take supplemental jurisdiction over her retaliation claims under the NYSHRL and the NYCHRL. *See supra* Pt. IV.A.1.

25

gap." (Sinai MTD 27–28.)

As mentioned *supra*, a retaliation claim requires a plaintiff to plead that "a causal connection exists between the alleged adverse action and the protected activity," *Treglia*, 313 F.3d at 719, "that is, the employer acted with a retaliatory motive," *Quadir*, 39 F. Supp. 3d at 542 (citations omitted). To establish this causal connection on the basis of temporal proximity alone, the "adverse action" must be "very close" in time to the protected activity. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted). Some courts have taken "[t]he passage of even two or three months [to be] sufficient to negate any inference of causation when no other basis to infer retaliation is alleged." *See, e.g.*, *Williams v. City of New York*, No. 11 Civ. 9679(CM), 2012 WL 3245448, at *11 (S.D.N.Y. Aug. 8, 2012); *see also Breeden*, 532 U.S. at 273–74 (citing with approval cases holding that three- and four-month gaps between protected activity and adverse action were insufficient to establish a causal connection). However, in the Second Circuit, there is no "bright line [that] define[s] the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship" sufficient for this element of the claim. *Summa v. Hofstra Univ.*, 708 F.3d at 128 (quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)). A court must look at the record before it to evaluate "the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Id.* ("In *Espinal,* we concluded that 'the passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by officers, one of whom . . . was a defendant in the prior lawsuit, [wa]s sufficient to support an inference of a causal connection.'" (alteration in original)). The same temporal analysis of causation is applicable to federal, NYSHRL, and NYCHRL retaliation claims. *See Mooney v. City of New York*, No. 18CV328(DLC), 2018 WL 4356733, at *8–9 (S.D.N.Y. Sept. 12, 2018).

26

Plaintiffs have failed to plead facts sufficient to show "a but-for caus[al]" connection between Misiti's increased workload and Singh's allegedly retaliatory motive. *Id.* at *8 (quoting *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018)). The sole basis for Misiti's retaliation claim is that her workload increased once Berman left AIGH, because she took on responsibilities that Berman had previously handled, and she did not receive an increase in pay. (*See* MTD Opp. 20–21.) Specifically, Plaintiffs plead that Berman left AIGH in "early July 2018," and that "[b]y November 2018," after Berman and "more AIGH employees left," Misiti had "many new responsibilities." (FAC ¶¶ 369, 373.) Here, similar to *Mooney*, Plaintiffs allege a five-month gap between Misiti's protected activity and the alleged retaliation, which "does not plausibly allege a causal connection," at least where, as here, Plaintiffs "allege[] no other linkage." *See* 2018 WL 4356733, at *9.

Plaintiffs argue that "Misiti alleged that Singh's retaliation *culminated* five months after Misiti's [May] complaint about Singh[] but *began* in early July." (MTD Opp. 20 (internal quotation marks omitted).) This is not a fair reading of what Plaintiffs plead in the FAC—they allege that "Berman told Misiti that she would likely be given much of his work" upon his departure from AIGH, "without a pay increase or title change. He was right." (FAC ¶ 371.) However, Plaintiffs do not plead that any relevant adverse employment action befell Misiti until "November 2018," when her "role had expanded considerably." (*Id.* ¶ 373.)

Accordingly, I find that the time between Misiti's protected activity and the alleged retaliation claim is too protracted to infer causation; therefore, Misiti's retaliation claims under the Thirteen Cause of Action are DISMISSED.

27

### 6. Plaintiffs Safo's and Llames' Claims, and Plaintiff Caliendo's Claims Against Berman[22]

#### a. Constructive Discharge Allegations

The Sinai Defendants argue that certain parts of Plaintiffs' claims premised on "constructive discharge" should be dismissed. (Sinai MTD 29.) The Sinai Defendants acknowledge that no Plaintiff has "explicitly pled" constructive discharge "as a claim for relief." (*Id.*) Rather, the Sinai Defendants identify several paragraphs in the FAC that mention "constructive discharge" as one of the adverse employment actions that befell certain Plaintiffs, and from that they argue "[b]ecause [P]laintiffs cannot establish claims for constructive discharge, those claims should be dismissed[,] and the Court should dismiss any claim for damages resulting from their resignations. (*Id.*) Given my dismissal of Anandaraja and Atkinson's claims, *supra*, the Sinai Defendants' argument would only serve to limit the scope of recovery available to Plaintiffs Stella Safo ("Safo") and Geraldine Llames ("Llames"). (*See id.* ¶¶ 600, 674.)

The term "constructive discharge" has two legally relevant meanings in employment discrimination actions. The first is as a claim for relief: sometimes "characterized as a 'hostile-environment constructive discharge' claim," a constructive discharge claim "requires that a plaintiff sufficiently allege a hostile work environment in order to adequately allege a constructive discharge claim." *Bright-Asante v. Saks & Co., Inc.*, 242 F. Supp. 3d 229, 243 (S.D.N.Y. 2017) (citation omitted). "Where an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff 'must show working conditions so intolerable that a reasonable person would have felt compelled to resign,'" which amounts to a "standard . . .

---

[22] This section relates to the Fifth through Tenth Causes of Action of the FAC, as well as to particular allegations which the Sinai Defendants seek to have dismissed.

28

higher than a standard for establishing hostile work environment." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) (quoting *Pa. State Police v. Suders,* 542 U.S. 129, 147 (2004)). The second is as the adverse employment action element of a separate employment discrimination claim: because "[a] constructive discharge is 'functionally the same as an actual termination,'" it "therefore is considered an adverse employment action." *Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 177 (E.D.N.Y. 2013) (quoting *Suders*, 542 U.S. at 148); *Fitzgerald*, 251 F.3d at 357 ("Adverse employment actions include discharge from employment. Such a discharge may be either an actual termination of the plaintiff's employment by the employer or a 'constructive' discharge."). The adverse employment action of constructive discharge can occur "when an employer 'intentionally creates a work atmosphere so intolerable that [the plaintiff] is forced to quit involuntarily.'" *Borski v. Staten Island Rapid Transit*, 413 F. App'x 409, 411 (2d Cir. 2011) (quoting *Terry v. Ashcroft,* 336 F.3d 128, 151–52 (2d Cir. 2003)). Courts have recognized a variety of circumstances that are so intolerable as to amount to constructive discharge, including those involving "drastic change[s] in employment status or responsibilities," and those that are sufficiently "humiliating." *See Bright-Asante*, 242 F. Supp. at 243 (collecting cases).

Here, Plaintiffs allege facts sufficient to support the inference that Safo and Llames suffered the adverse action of constructive discharge by being subjected to conditions "so difficult or unpleasant that a reasonable person in [their] shoes would have felt compelled to resign." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996). Singh regularly belittled Safo's intelligence and capabilities, and he regularly reprimanded her in extreme ways for trivialities—in one instance, he "pulled her out" of a meeting with potential donors to chastise her for "not . . . circulat[ing]" an email about a birthday cake more widely. (*See* FAC ¶¶

29

308–317.)  Silva regularly talked to others at AIGH about Safo with gendered and misogynistic epithets and phrases.  (*See, e.g., id.* ¶¶ 419 ("[Silva] told Llames that '[Safo] is a cunt.  She just needs to get laid.'  Silva told others that Safo was a 'bitch,' a 'cunt,' 'uptight,' and a 'control freak.'"), 420 ("that bitch [Safo] is stealing my work" (alteration in original)).)  Llames alleges she was subjected to similar gendered epithets, (*see id.* ¶¶ 413–15)), and in "at least half a dozen" "weekly status meetings," Singh "skipped over" Llames "as if she did not exist" when it would normally have been her turn to speak, (*id.* ¶ 333).  This is more than enough to plead the adverse employment action of constructive discharge.

### b.  Claims Against Berman

Berman, who was Singh's chief of staff at AIGH, (FAC ¶¶ 8, 130), moves to dismiss Counts 5 through 10 as asserted against him by Plaintiffs Caliendo, Safo, and Llames.  (Berman MTD 1.)  In response to Berman's motion to dismiss, Plaintiffs concede that their federal claims cannot proceed against Berman—they only argue that they "have sufficiently pleaded individual claims against him under the [NYSHRL] and the [NYCHRL]."  (MTD Opp. 22.)

I have already dismissed Caliendo's federal claims against the Sinai Defendants, *supra* Pt.IV.A.3, which means Caliendo has no remaining federal claims in this action.  Accordingly, I do not take supplemental jurisdiction over her state law claims against Berman, *see supra* Pt IV.A.1; therefore, those claims are DISMISSED.  The only question remaining as to Berman is whether Safo and Llames sufficiently plead their state law claims under the NYSHRL and the NYCRL against him, both of which are premised on disparate treatment and hostile work environment.[23]

---

[23] I have supplemental jurisdiction over Safo's and Llames' state law claims as all of their claims—those under federal law and those under state law—are proceeding against the Sinai Defendants and are thus before the Court. *See supra* Pt. IV.A.1.

"While the Title VII test applies to claims under the NYSHRL, claims under the NYCHRL are to be considered independently and construed more broadly in favor of plaintiffs alleging discrimination." *Bonterre v. City of New York*, No. 18 CIV. 745 (ER), 2021 WL 4060358, at *4 (S.D.N.Y. Sept. 7, 2021) (internal citations omitted). The NYCHRL makes it "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the . . . gender . . . of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8–107(1)(a). "To prevail on liability" for a disparate treatment claim under the NYCHRL, "the plaintiff need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013). Furthermore, "[i]t is not enough that a plaintiff has an overbearing or obnoxious boss. She must show that she has been treated less well at least in part '*because of* her gender.'" *Id.* (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 78 (1st Dep't 2009)). Similarly, "[i]n order to succeed on a NYCHRL hostile work environment claim, a plaintiff must show that he was treated 'less well than other employees' on the basis of a protected characteristic." *Alvarado*, F. App'x at 8 (citation omitted).

Safo's NYCHRL claims against Berman fail because Plaintiffs plead no facts suggesting either that Berman treated her less well than others due to her gender or that he participated in anyone else's discriminatory treatment of her because of her gender. Plaintiffs identify instances where Berman reprimanded Safo for seemingly-trivial things, (*see, e.g.*, FAC ¶ 314 (alleging that Berman wrote an email to Singh calling Safo "'exclusive' and bad for AIGH culture" because "she did not happen to circulate her birthday cake email to everybody at AIGH.")), but nothing

in the pleadings suggests there was "discriminatory intent in the unpleasant conduct alleged,"

*Livingston v. City of New York*, No. 19 CIV. 5209 (KPF), 2021 WL 4443126, at *31 (S.D.N.Y.

Sept. 28, 2021) (quoting *Dressler v. N.Y.C. Dep't of Educ.*, No. 10 Civ. 3769 (JPO), 2012 WL

1038600, at *14 (S.D.N.Y. Mar. 29, 2012)).  Similarly, Safo fails to allege that Berman

participated in any conduct in which Safo was treated less well because of her gender.  Although

Safo states that she "frequently observed Singh, Berman and Silva listen attentively to men's

opinions in meetings while ignoring women," (FAC ¶ 309), this general comment about women

is insufficient because it does not speak to any treatment Safo herself faced.  To be sure, Safo

does allege that "Singh would allow male heads of departments to introduce their work, but,

when it was Safo's turn to present on Health System Design, Singh did it himself, allowing Safo

only brief interjections between his long remarks." (*Id.*)  This is enough for Safo to have pleaded

facts sufficient to state claims under the NYCHRL against Singh and the other Sinai

Defendants—who do not move to dismiss her claims—but no pleaded facts involve Berman in

any relevant conduct.

Llames' NYCHRL claims against Berman also fail for the same reason:  there is nothing

in Plaintiffs' pleadings to suggest that gender factored into Berman's alleged unpleasantness

towards her.  Indeed, all Llames pleads about Berman and gender is that she "knew of Berman's

short temper with female subordinates." (FAC ¶ 399.)  However, in describing how "Berman

[would] suddenly started yelling at [her]" and other employees, Llames offers no facts indicating

that Berman's behavior had anything to do with her gender, or that Berman treated any similarly

situated male employees any better. (*See id.* ¶¶ 400–402.)  *Cf. Mihalik*, 715 F.3d at 114–15

(holding that a plaintiff could proceed beyond summary judgment where there was evidence

"that it was sexually-charged conduct that subjected Mihalik to a different set of employment

32

conditions than her male colleagues."). To be sure, the facts alleged regarding Berman do not depict him as anything close to a model colleague, but the NYCHRL does not "operate as a 'general civility code.'" *Williams*, 61 A.D.3d at 78 (citation omitted).

Where, as here, Plaintiffs fail to assert NYCHRL claims, similarly-premised NYSHRL claims will also fail, because the NYCHRL provides "a broader basis for . . . liability than the NYSHRL" does. *See, e.g.*, *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012); *Bonterre*, 2021 WL 4060358, at *4; *Chin v. New York City Hous. Auth.*, 106 A.D.3d 443, 444 (1st Dep't 2013) (explaining that NYSHRL retaliation claims require "adverse employment action," whereas similar NYCHRL claims only require a showing that defendant's conduct "disadvantaged plaintiff").

Accordingly, Safo's and Llames' NYCHRL and NYSHRL claims against Berman are DISMISSED.

### 7. Proposed Plaintiff Beddoe

Plaintiffs seek to join Beddoe as a plaintiff in the SAC asserting retaliation claims against Charney and Sinai under Title IX, Title VII, the NYSHRL, and the NYCHRL. (SAC ¶ 217). Specifically, the SAC pleads that Beddoe voiced "concerns to Charney . . . and other senior Mount Sinai administrators" about Singh and how he "dismissed and targeted the women who worked for him," as well as that, in March 2019, Beddoe "provided testimony in support of the original Complaint in this action." (*Id.* ¶¶ 491, 571.) Then, in February of 2020, when it was time for Beddoe's appointment at Sinai to be renewed, she was offered "$50,000 less" in "annual compensation" than she had been paid under her prior three-year contract, meaning she would receive a "total compensation" of "$300,000" less "over the [next] three-year term." (*Id.* ¶ 582.) Beddoe took the job anyway. (*Id.*) Two Sinai employees told Beddoe conflicting stories as to

why her salary was being cut—one said it was because "her Director of Chemotherapy title was removed," which Beddoe alleges was a "role" for which "she had never been compensated," (*id.* ¶ 583), whereas the other said her salary was cut because "she had not brought in sufficient revenue," (*id.* ¶ 584).

The Sinai Defendants only challenge whether Beddoe can properly be joined as a plaintiff in this action under Federal Rule of Civil Procedure 20. (Sinai Leave Opp. 19.) "Pursuant to Rule 20(a), proper joinder of parties requires the satisfaction of two criteria: (1) the right to relief sought by all plaintiffs must arise out of the same transaction or occurrence, or series of transactions or occurrences; and (2) a common question of law or fact as to all plaintiffs must arise in the action." *Puricelli v. CNA Ins. Co.*, 185 F.R.D. 139, 142 (N.D.N.Y. 1999). "[B]oth criteria must be met for joinder to be proper" under the plain language of Rule 20." *Wilson-Phillips v. Metro. Transp. Auth.*, 18 Civ. 417 (VEC), 2018 WL 5981736, at *2 (S.D.N.Y. Nov. 14, 2018) (quoting *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 159 (S.D.N.Y. 2009)). "The first requirement is satisfied if the court finds that 'the essential facts of the various claims are so *logically connected* that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'" *Ardolf v. Weber*, 332 F.R.D. 467, 479 (S.D.N.Y. 2019) (quoting *Deskovic*, 673 F. Supp. 2d at 166). The second requirement is satisfied where there is a "*substantial* overlap of witnesses or documentary proof." *Wilson-Phillips*, 2018 WL 5981736, at *3 (quoting *In re Blech Sec. Litig.*, No. 94 CIV. 7696 (RWS), 2003 WL 1610775, at *13 (S.D.N.Y. Mar. 26, 2003)). In employment discrimination cases, there is strong authority for the proposition that "multiple plaintiffs" cannot use Rule 20(a) to bring "discrimination claims against the same employer" unless there is sufficient "overlap of the facts in the plaintiffs' claims." *Id.* at *4; *see, e.g.*, *Byrd v. District of Columbia*, 807 F. Supp. 2d

34

37, 76 (D.D.C. 2011) ("Byrd and Jean–Baptists' hostile work environment and retaliation claims do not implicate a common question of law or fact. The alleged harassment occurred at different times, was committed by different supervisors, at entirely different locations."); *Tardd v. Brookhaven Nat. Lab'y*, No. 04 CV 3262 (ADS), 2007 WL 1423642, at \*10 (E.D.N.Y. May 8, 2007) ("Even though there is some overlap of the facts in the plaintiffs' claims, namely having to do with White's appointment as a mentor for Tardd and White's development of the 'path-forward' plan, these similarities do not overcome the numerous differences in the circumstances giving rise to the plaintiffs' claims for relief."). *Cf. Ardolf*, 332 F.R.D. at 480 ("Therefore, at issue for all Plaintiffs is at least one common question of law: whether Defendant's *modus operandi* of fondling Plaintiffs' genitals during private photoshoots constitutes sex trafficking." (internal quotation marks omitted)).

Beddoe's claim does not meet Rule 20(a)'s requirements. Specifically, her claim fails the first requirement because of the "broad temporal gap" between the facts giving rise to her claims and those of the other Plaintiffs. *Cf. Deskovic*, 673 F. Supp 2d at 167. Whereas the other Plaintiffs' claims span a period largely through 2016, the adverse employment action underlying Beddoe's claim arose in February 2020 when she was forced to renew her appointment at "$50,000 less" in "annual compensation." (*See* SAC ¶ 582.) Second, there is insufficient overlap between the proof that would establish Beddoe's claim and the proof relevant to the Plaintiffs who still have claims in this action. To prove her retaliation claim, Beddoe will have to show that Charney and Sinai were motivated to lower her salary because she aided the Plaintiffs in this lawsuit. No other remaining claim in this action is premised on retaliation stemming from the filing of this lawsuit.

Plaintiffs argue that Beddoe's claims are proper because they "encompass the broader

35

hostile work environment created and fostered by Charney," (Doc. 76, at 16); however, Rule 20's requirements are not satisfied simply because all Plaintiffs allege they suffered under "the same overarching discriminatory culture," at least where, as here, there are "few" if any "common questions of fact" between Beddoe's claim and those of other Plaintiffs, *see Wilson-Phillips*, 2018 WL 5981736, at *3. Therefore, Beddoe cannot be properly joined to this case.

### B. *Motion for Leave to File the Second Amended Complaint*

Having found Beddoe's joinder improper, there is no further basis for allowing Plaintiffs to file the proposed SAC, as I have now found that the proposed amendments are all either improper or futile. Accordingly, Plaintiffs' motion for leave to file the proposed SAC is DENIED.

### C. *The Motion to Strike*

The Sinai Defendants move to strike the entirety of the FAC on the grounds that it is a "lengthy complaint . . . rife with allegations that are immaterial and/or scandalous." (Strike Mot. 1.)[24] They say that the point of the FAC was "to maximize reputational damage," (*id.*), and they argue that various paragraphs should be stricken under the standards governing a motion to strike, (*see, e.g.*, *id.* at 4–5 (arguing that, among others, FAC ¶¶ 64, 79, 81, 84, 209, 230, and 515 would be inadmissible hearsay that could not be proven)). However, the Sinai Defendants use the particular paragraphs they identify to argue that the FAC should be stricken "in its entirety," on the grounds that "neither the Court nor defendants should bear the burden of parsing the 889 paragraphs" of the FAC to separate the wheat from the chaff. (*Id.* at 12–13.)

"Under Rule 12(f), the party moving to strike 'bears a heavy burden'" of persuading the

---

[24] "Strike Mot." refers to the Sinai Defendants' Memorandum of Law in Support of Their Motion to Strike. (Doc. 37.)

reviewing court why specific portions of a pleading should be stricken.  *See, e.g.*, *Walczak v. Pratt & Whitney*, No. 3:18-cv-563 (VAB), 2019 WL 145526, at *2–3 (D. Conn. Jan. 9, 2019) (finding that "the allegations in Paragraph 43" of a complaint had "no basis" for being part of the "lawsuit"); *Cnty. Vanlines Inc. v. Experian Info. Sols., Inc.*, 205 F.R.D. 148, 155 (S.D.N.Y. 2002) ("plaintiff fails to meet his burden of demonstrating why he will be prejudiced by the inclusion of the[] [specific] defenses" he sought to strike); *see also Powermat Techs., Ltd. v. Belkin Int'l Inc.*, No. 19-CV-878 (VSB), 2020 WL 2892385, at *11 (S.D.N.Y. Apr. 2, 2020) (denying motion to strike as moot while noting that plaintiff "contends that it did not bear the burden of establishing the insufficiency of those defenses" it sought to strike and only "discussed them on reply because" its adversary "raised them in its opposition.").

Although it is true that "[w]hen a complaint does not comply with [Rule 8's] requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial, or to dismiss the complaint," that is meant to spare the court from having to parse a "complaint [that] is so confused, ambiguous, vague, or otherwise unintelligible that its true substance" cannot be deciphered.  *See Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (internal citation omitted).  Here, I have already determined that several of the Plaintiffs have pleaded sufficient claims in the FAC.  In other words, I have already parsed through the allegations of the FAC; therefore, I find that it would not be appropriate to strike the entire FAC at this time.  Moreover, because the FAC was filed over two years ago, it is likely that any damage the filing of its more "scandalous" allegations may have caused has been substantially diminished by the passage of time; therefore, striking the FAC would provide scant if any remedy to the prejudice its filing may have caused the Sinai Defendants.  *See Cnty. Vanlines*, 205 F.R.D. at 153 ("[A]bsent a showing of prejudice,

37

[a] motion to strike must be denied.").

Accordingly, the Sinai Defendants' motion to strike is DENIED.

### V.    Conclusion

For the foregoing reasons, Berman's motion to dismiss is GRANTED; the Sinai Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART; their motion to strike is DENIED; and Plaintiffs' motion for leave to file the SAC is DENIED.

Given my disposition, Plaintiffs Atkinson's, Anandaraja's, Khan's, and Caliendo's federal claims are DISMISSED with prejudice, and their state law claims are DISMISSED without prejudice.  Plaintiff Misiti's federal and state law retaliation claims under the Thirteenth Cause of Action are DISMISSED with prejudice.  Plaintiffs Safo's and Llames' claims against Berman are DISMISSED with prejudice.

In summary, Plaintiffs Atkinson, Anandaraja, Khan, and Caliendo no longer have causes of action in this case; proposed Plaintiff Beddoe cannot join this action; and Defendant Berman is dismissed from this action.[25]

SO ORDERED.

Dated: January 14, 2022 ~~January 13, 2022~~
New York, New York

_____
Vernon S. Broderick
United States District Judge

---

[25] For any Plaintiff whose claim or claims were dismissed in this Opinion & Order without prejudice, she or he is reminded that the statute of limitations as to those state law claims is tolled for at least "30 days" upon entry of this order.  *See* 28 U.S.C. § 1367(d).